UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-60383-CIV-ZLOCH
MAGISTRATE JUDGE P.A. WHITE

RONALD C. WILLIAMS,                :

    Plaintiff,                  :

v.                                 :
                                             REPORT OF
JOSEPH MERCOGLIANO, et al.,        :   MAGISTRATE JUDGE

    Defendants.                 :
_____

## I. Introduction

The plaintiff Ronald C. Williams, currently incarcerated at the Okechobee Correctional Institution, filed an amended pro se civil rights complaint pursuant to 42 U.S.C. §1983, raising claims of excessive use of force upon his arrest on March 29, 2004, by City of Plantation Police Officers Joseph Mercogliano, Steven Bowser and Jason Grace. [DE# 6].

Specifically, Williams raised the following allegations. Bowser heard a BOLO ("be on the lookout") on the police radio describing an African-American male, driving a burgundy car, wearing a white chef's coat. Bowser then observed the plaintiff, an African-American male, driving a maroon car wearing a white tee shirt. Bowser did not observe the plaintiff commit any traffic infractions or any other crimes. Believing that the plaintiff was the subject in the BOLO, he began a pursuit. Bowser was driving an unmarked F-150 truck, was wearing civilian clothes and the plaintiff was unaware that Bowser was a police officer. Bowser pulled his truck next to the plaintiff's car and yelled several racial slurs at him, ordering him to pull over. Bowser then blocked the plaintiff's car with his truck and exited the truck. The plaintiff saw that Bowser had a gun, and he backed up his car to escape from Bowser. As the plaintiff was fleeing from Bowser,

Mercogliano, a uniformed police officer, gave chase on a motorcycle.  Mercogliano approached the plaintiff with a gun in hand yelling racial slurs.  The plaintiff saw that Mercogliano was a uniformed police officer, and he attempted to cooperate by unlocking his car door, but inadvertently lowered the rear passenger window.  At that point, Mercogliano fired his weapon into the plaintiff's car, hitting him in the thigh.  The plaintiff then drove forward, and Mercogliano fired three more times towards the vehicle.  The plaintiff then stopped the car and leaned over the steering wheel, and Mercogliano opened the car door, shouted racial slurs, and punched him in the face.  Officers Bowser and Grace arrived and helped Mercogliano drag the plaintiff out of the car, and they kicked him a few times while laughing.  The plaintiff states that he was convicted of burglary of a dwelling and petit theft, while charges of attempted murder on a LEO, aggravated assault on a LEO, and fleeing and eluding were nolle prossed.

This Cause is before the Court upon the defendant Mercogliano's Motion to Dismiss [DE# 22] and the joint Motion to Dismiss filed by the defendants Bowser and Grace [DE# 24], both of which have been converted to Motions for Summary Judgment.  Each of the motions includes as an exhibit the Sworn Statement of Ronald Williams, taken at the Broward General Hospital on March 29, 2004.

The plaintiff Williams filed a Response [DE# 39, captioned "Brief in Opposition to Defendants Summary Judgment Motion") and several exhibits opposing the Motions for Summary Judgment, after the entry of an Order of Instructions informing Williams of his right to do so, and instructing him about the requirements under Fed.R.Civ.P. 56 for a response to such a motion.  With his Response [DE# 39] Williams submitted the following exhibits: (1) Pictures of

Unmarked Blue F-150 Truck (Exh. A)[1]; (2) Statement of Simeon Salzedo (Exh. B); (3) Trial transcript, portions of the testimony of Simeon Salzedo and Mike Dechert (Exh. C); (4) Picture of bullet holes in rear of vehicle (Exh. D); (5) Picture of crime scene (Exh. E); (6) Pictures of the plaintiff (Exh. F); (7) Trial transcript, portion of the testimony of Mercogliano (Exh. G); (8) Arraignment transcript (Exh. H); and (9) Arrest Affidavit (Exh. I). [DE# 40].

The defendants filed a joint Memorandum of Law in Reply to Plaintiff's Response to the Defendants' Converted Motion for Summary Judgment [DE# 48], accompanied by the following exhibits: (1) Uniform Referral Form - Broward County Health Providers dated March 29, 2004 signed by Dr. Menendez; (2) Deposition Transcript of Officer Joseph Mercogliano taken on November 30, 2004; (3) Deposition of Officer Jason Grace taken on July 22, 2004; (4) Florida Traffic Crash Report dated March 29, 2004; (5) Deposition of Michael Dechert taken on September 10, 2007; and (6) Statement of Simeon Salzedo dated March 29, 2004. [DE# 49].

In further opposition to the defendants' Motions for Summary judgment, the plaintiff Williams filed a Memorandum of law [DE# 50] and the following additional exhibits: (1) Photograph of shot; (2) Trial transcript, portion of the testimony of Ronald C. Williams; (3) Plantation Police Department General order 14; (4) Internal

---

[1] As of the date of this Report, the Undersigned does not have original or legible copies of any of the photographs produced as exhibits. Nevertheless, the absence of these exhibits does not impact the ultimate recommendation that the pending Motions for Summary Judgment be denied. Although the plaintiff has submitted a photograph which purportedly shows the angle of Mercogliano's first shot, which hit him in the thigh, this is simply a representation of where the plaintiff contends Mercogliano was standing, not proof of such. Similarly, s photograph showing bullet holes in the rear of the vehicle does not support any claim with regard to the first shot. The Clerk is in the process of attempting to locate the original exhibits.

Affairs Investigation, Statement of Patricia Kreling; and (5) Photographs of bullet holes. [DE# 51]. No parties have submitted any statements or testimony from Bowser.

## II. Discussion

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is proper

> [i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c).

In Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Court held that summary judgment should be entered only against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. (citations omitted). Thus, pursuant to Celotex and its progeny, a movant for summary judgment bears the initial responsibility of informing the court of the basis for his motion by identifying those parts of the record that demonstrate the nonexistence of a genuine issue of material fact. This demonstration need not be accompanied by affidavits. Hoffman v. Allied Corp., 912 F.2d 1379, 1382 (11 Cir. 1990). If the party seeking summary judgment meets the initial burden of demonstrating

4

the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party, to come forward with sufficient evidence to rebut this showing with affidavits or other relevant and admissible evidence. Avirgan v. Hull, 932 F.2d 1572, 1577 (11 Cir.), cert. denied, 112 S.Ct. 913 (1992). It is the nonmoving party's burden to come forward with evidence on each essential element of his claim sufficient to sustain a jury verdict. Earley v. Champion International Corp., 907 F.2d 1077, 1080 (11 Cir.1990). The non-moving party cannot rely solely on his complaint and other initial pleadings to contest a motion for summary judgment supported by evidentiary material, but must respond with affidavits, depositions, or otherwise to show that there are material issues of fact which require a trial Fed.R.Civ.P. 56(e); Coleman v. Smith, 828 F.2d 714, 717 (11 Cir. 1987). If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Baldwin County, Alabama v. Purcell Corp., 971 F.2d 1558 (11 Cir. 1992). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11 Cir. 1990) (citing Anderson v. Liberty Lobby, Inc., supra).

Pursuant to Brown v. Shinbaum, 828 F.2d 707 (11 Cir. 1987), the Order of Instructions to the pro se plaintiff Williams was entered [DE# 30], concerning his right to respond to the defendants' motions for summary judgment. The Order instructed Williams of the requirements under Fed.R.Civ.P. 56 for a proper response to such a motion, and informed him that he could respond.

In the Motions for Summary Judgment [DE#'s 22, 24], which the plaintiff Williams was informed would be treated as a motion for

5

summary judgment pursuant to Fed.R.Civ.P. 56 (see Order of Instructions, DE# 30), the defendant Mercogliano argues that Williams has failed to establish an actionable constitutional claim because the facts alleged establish that Williams posed a substantial objective threat to his safety because the plaintiff was in possession of a deadly weapon (his automobile), it was reasonable for him and the other officers to perceive immediate, imminent and deadly harm, and Williams posed an equally significant flight risk. Mercogliano also argues that even if Williams could state an excessive force claim, he and the other officers are entitled to qualified immunity. Mercogliano also argues that Williams is alleging that the only use of force were the gunshots; that Williams does not allege that any officers used excessive force after he was subdued and handcuffed. Bowser and Grace argue that the plaintiff has failed to state an actionable constitutional claim against them because the force they allegedly used was de minimus and used only to legitimately take Williams into custody and, nevertheless, they are entitled to qualified immunity. They note that the Preliminary Report construes the Amended Complaint to allege that all three officers kicked and punched Williams as they extracted him form his vehicle, but the Amended Complaint actually alleges only that Mercogliano punched the plaintiff while Bowser and Grace kicked him.[2]

Because the original two motions [DE#'s 22, 24] were based on a motion to dismiss standard, after the Court converted the motions, the defendants filed a joint Memorandum of Law with further exhibits, and argue specifically that there are no genuine

---

[2] It is now clear that the plaintiff is alleging that all three defendants punched and kicked him. The plaintiff submits no medical evidence with regard to any of his injuries, other than his sworn representation that his teeth were knocked out and that he now walks with a limp.

6

issues of disputed fact and they are entitled to judgment as a matter of law. [DE# 48].  They raise the following argument.

1.   In Williams' sworn statement taken shortly after his arrest, he states that his only injury was a gunshot, and further testified that he because he was so high on crack at the time of the incident, he was unsure of what happened.[3]

2.   The medical records show that the plaintiff's only injury was a gunshot wound.

3.   Although the plaintiff now alleges that his teeth were knocked out, the Amended Complaint lacks any allegations of fact which indicate the use of any force which could have caused the plaintiff's teeth to be knocked out.

4.   The plaintiff was admittedly high on crack, which itself posed a danger to others, and the plaintiff refused to pull his vehicle over when ordered to do so and he fled from three law enforcement officers.[4]

5.   Witnesses observed the plaintiff steer his vehicle toward Mercogliano such that Mercogliano feared for his life.

6.   The plaintiff has misrepresented and misconstrued the witness testimony of Dechert and Salzedo, contradicting Dechert's sworn testimony that the plaintiff was trying to <u>get</u> away, not

---

[3] The plaintiff now challenges the accuracy of his statement, arguing that he gave the statement under duress. [DE# 50].

[4] The defendants have submitted no other evidence concerning the plaintiff's alleged drug use on the day of the arrest.

7

<u>moving</u> away from Mercogliano, and that the plaintiff's vehicle was coming at Mercogliano in an out of control fashion; and contradicting Dechert's testimony that the plaintiff was trying to hit Mercogliano.

7.   The totality of the circumstances obviates any possible constitutional violations.

8.   The plaintiff's "vague allegations of feeling like he was kicked prior to handcuffing" do not strip the defendants of qualified immunity.

9.   Mercogliano is entitled to qualified immunity with regard to the use of his firearm because (a) the plaintiff was a fleeing felon;[5] (b) he had already caused an accident with a civilian

---

[5] Curiously, the defendants cite a 1985 Eleventh Circuit case which concerned the use of deadly force upon a fleeing suspect prior to the Supreme Court's seminal case, <u>Tennessee v. Garner</u>, 471 U.S. 1 (1985)(discussed below), to define the plaintiff as a "fleeing felon." The defendants focus mainly on one part of the <u>Garner</u> test, arguing that the plaintiff objectively posed a threat to Mercogliano. Notably, the defendants do not argue that the force was necessary to prevent escape or whether it was feasible to give a warning before the shot was fired. As in the cited case, <u>Acoff v. Abston</u>, 762 F.2d 1543, 1547 (11 Cir. 1985), the evidence in this case could support a jury finding that the use of potentially deadly force transgressed constitutional standards. Given the plaintiff's account of the events in which he was able to hear Mercogliano yelling racial slurs, a jury might conclude that a warning was feasible, and this alone would have established a violation of the legal standard.

The Undersigned also notes that the old common law "fleeing felon" rule, which allowed the use of whatever force was necessary to effectuate the arrest of a fleeing felon, has been abrogated for at least two decades. The <u>Garner</u> Court held that the killing of an unarmed burglar to prevent his escape was an unconstitutional seizure. The Supreme Court recognized that the common-law rule had been fashioned "when virtually all felonies

motorist; (c) he was high on crack cocaine; and (d) it objectively appeared to Mercogliano that the plaintiff was trying strike him with his automobile.

In the plaintiff's Brief in Opposition to the Defendants' Motions for Summary Judgment, which includes his Sworn Affidavit [DE# 39], he argues:

1.   The plaintiff was not aware that Bowser was a police officer, as he was in an unmarked vehicle, used racially derogatory remarks and was brandishing a gun, and the plaintiff fled from Bowser in fear of his life.

2.   After Bowser knocked the plaintiff's automobile out of control, Mercogliano (who was uniformed and on a motorcycle) approached him using racially derogatory remarks and was brandishing a gun, and the plaintiff attempted to open the passenger door for the officer, but Mercogliano shot him through the open rear window, hitting him in the upper left thigh.

3.   The plaintiff then drove away from Mercogliano, who fired three more shots into the rear of the plaintiff's vehicle.

4.   After he was stopped, Mercogliano punched the plaintiff in the face, and the three officers dragged him from his car, and began to punch and kick him while yelling racial slurs, knocking his teeth out.

---

were punishable by death" and long before firearms were available to the police, and noted that modern police departments in a majority of large cities allowed the firing of a weapon only when a felon presented a threat of death or serious bodily harm, that "changes in the legal and technological context" had made the old rule obsolete.  Garner, 471 U.S. at 13-19.

   5.   Other unidentified officers were present and blocked the view of witnesses.

   There are two separate sets of claims: (1) Mercogliano used constitutionally excessive force by shooting the plaintiff; and (2) Mercogliano, Grace and Bowser engaged in excessive force after he was stopped.  The parties do not disagree that on March 29, 2004, Officer Bowser initiated a high speed chase in an effort to stop the plaintiff's vehicle based on Bowser's identification of the plaintiff after hearing a BOLO.  The parties also do not dispute that the plaintiff was not aware that Bowser was: a police officer, in plain clothes, driving an unmarked vehicle, yelling racial slurs, and brandishing a gun. The parties disagree with regard to the circumstances of Mercogliano's first shot and the events that transpired upon the plaintiff's extraction from his vehicle.

   The plaintiff has submitted a portion of a transcript of the deposition of civilian witness Simeon Salzedo, taken on July 27, 2007.  (DE# 40, Exh. B).  Salzedo testified that he witnessed Bowser chasing Williams and was unaware that Bowser was a police officer: "My first thought these two guys were in a fight or in an accident, someone took off.  I didn't see any police officers right away." (Id. at p. 6).  Salzedo further testified that he witnessed Bowser cut off the plaintiff, and both vehicles stopped.  He observed Mercogliano and Grace, who were uniformed police officers on motorcycles, arrive and get off their bikes and walk toward the vehicles.  (Id. at p. 7).  Salzedo then testified that the two uniformed officers "must have gotten about 15 feet from the motorcycle, and the car took off and the truck took off again." (Id.).  Salzedo saw Bowser cut off Williams again, and they both stopped.  (Id. at p. 8).  Salzedo still was not aware that Bowser was a police officer.  (Id.).  Salzedo then observed one officer (apparently Mercogliano) stop his motorcycle, at which time the

plaintiff put his car in reverse, "aiming right for the motorcycle mostly.  Basically my first thought was he was going to hit the officer."  (Id.).  Salzedo then observed the officer drop down and roll away from the motorcycle, and then jump up when the plaintiff put his car back in forward and "took off."  (Id. at p. 9).  Salzedo then testified that he observed the officer run toward the plaintiff's car as he was driving away, and he observed the officer fire three shots.  He then observed the plaintiff's car swerve and stop on the sidewalk, and he observed Mercogliano drag the plaintiff out of his car.  (Id.).

The plaintiff has also submitted what appears to be a portion of the trial testimony of Salzedo.  (DE# 40, Exh. C).  Salzedo testified that when Mercogliano went for his holster for the first time, the plaintiff's car was moving away from the officer.  Salzedo stated:  "The officer was running after him, basically running across the street after him," and that's when the shots were fired. (Id. at pp. 389-90).

The defendants have submitted the transcript of the statement given by Salzedo to police on the date of the incident.  (DE# 49, Exh. 6).  Therein, Salzedo stated that he observed the plaintiff's car in reverse and "it looked like he was gonna ram the motorcycle officer" and then the plaintiff drove away, and the officer fired three shots.  (Id. at 5).  Salzedo stated also that the plaintiff's car was "pulling away" when Mercogliano grabbed his gun.  (Id.).

Civilian witness Mike Dechert was deposed on October 10, 2007.[6]  He testified that he saw the plaintiff's car jump the curb

---

[6] The plaintiff alleges that defense counsel notified his classification officer that the deposition had been cancelled, which was false, and the plaintiff was not able to participate. [DE# 50 at 6].

and "kind of swerve" at one of the officers.  (DE# 49, Exh. 5 at 9).  At trial, Dechert testified that Mercogliano did not reach for his holster or fire shots until the plaintiff was fleeing away from the officer.  (DE# 40, Exh. C).

At a deposition, Mercogliano testified that after he dismounted his motorcycle, he drew his gun, and then the plaintiff started his car and drove toward him at a high rate of speed, and shot the plaintiff through the front windshield.  (DE# 40, Exh. G; DE# 49, Exh. 2). Mercogliano testified that as he was standing near the plaintiff's stopped vehicle with his gun drawn: "When I was giving him the loud commands, let me see your hands, he had his hands under the dashboard.  I didn't know what he was doing and noticed the vehicle was started.  He had a bizarre look to himself.  There was something about his eyes or something I just noticed that was not normal.  He got the vehicle started and he abruptly started coming at me.  And at that point, I knew Officer Grace was nowhere near me.  I was concerned that there was oncoming traffic and I was in fear for my life and safety and I discharged my firearm."  Grace testified at his deposition that "as I'm approaching I see the guy drive right at Joe [Mercogliano].  Enough where I'm going, Joe is definitely hit or going to get hit.  I was definitely in fear for Joe's life.  He's definitely going to get hit.  As I'm approaching now say it's within a 100 yards, closing in, I see the car coming at Joe.  Joe was able to move out fo the way and start shooting rounds."  (Exh. 3).

At a pretrial hearing, the plaintiff testified, with regard to Mercogliano, as follows: "He came to the side of my car.  When he came to side of my car. I tried to let the – open up the door because he was yanking on the car, let me see your f'ing hands.  So I went to let the window down, opened up the door and the back window came down.  He took a side step back and shot.  When he

12

shot, he came, hit me in the leg, right.  I put the car in drive and went forward like this and he shot three more shots in the back of the car bang, bang, bang."  (DE# 40, Exh. B).  The plaintiff repeated the essence of this statement at trial.  (Id.).

Mercogliano stated at his deposition that after the plaintiff was stopped, Mercogliano ran to the passenger's side of the car, Bowser went to driver's side and removed the plaintiff from his vehicle, and Bowser and Grace handcuffed him.  (DE# 49, Exh. 2). Mercogliano stated that he had no contact with the plaintiff at that point, that he saw the other two officers grab the plaintiff and put him on the ground, and his vision was blocked.  (Id.). Grace testified at his deposition that Bowser removed the plaintiff from the car and placed the plaintiff on the ground, and he and Bowser placed the plaintiff in handcuffs.  (DE# 49, Exh. 3). Neither officer testified as to the alleged use of force after the plaintiff was removed from his car.  The defendants have submitted the Report of Dr. Menendez dated March 29, 2004 which shows only that the plaintiff received a gunshot wound to his left thigh. (DE# 49, Exh. 1).

A claim that a law enforcement officer used excessive force in the course of an arrest, an investigatory stop, or any other seizure of a free citizen is to be analyzed under the Fourth Amendment and its "reasonableness" standard. Graham v. Connor, 490 U.S. 386 (1989); Vinyard v. Wilson, 311 F.3d 1340, 1346-47 (11 Cir. 2002); Lee v. Ferraro, 284 F.3d 1188, 1197 (11 Cir. 2002); Ortega v. Schram, 922 F.2d 684, 694 (11 Cir. 1991). "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham, 490 U.S. at 396. However, "[t]he use of excessive force in carrying out an arrest constitutes a violation of the Fourth Amendment."  Rodriguez v. Farrell, 280 F.3d 1341,

13

1351 (11 Cir. 2002). To establish such a Fourth Amendment violation, Plaintiff must show (1) that a seizure occurred and (2) that the force the defendants used to carry out that seizure was unreasonable. Harris v. Coweta County, 433 F.3d 807, 812-13 (11 Cir. 2005).

The reasonableness inquiry is made from the perspective of a reasonable officer on the scene. The question is whether the defendants' conduct was objectively reasonable, in light of all the facts and circumstances confronting them without regard to their subjective intent or motivation. Such an analysis requires a court to balance "the nature and quality of the intrusion on the individual's fourth amendment interests against the importance of the government interest alleged to justify the intrusion." Graham, supra, quoting United States v. Place, 462 U.S. 696 (1983). The factors a Court considers when balancing the necessity for an application of force against an arrestee's constitutional rights include: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight; Graham, supra, 490 U.S. at 396; Vinyard, supra, 311 F.3d at 1347; Lee, supra, 284 F.3d at 1197; Ortega, supra, 922 F.2d at 695. In determining whether force applied was "reasonable" under the circumstances (i.e., proportional to the need for its use), the Court must examine: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; and (3) the extent of the injury inflicted upon the individual to whom the force was applied. Vinyard, at 1347; Lee at 1998.

The use of potentially deadly force is reasonable: when an officer "(1) 'has probable cause to believe that the suspect poses

a threat of serious physical harm, either to the officer or to others' or 'that he has committed a crime involving the infliction or threatened infliction of serious physical harm;' (2) reasonably believes that the use of deadly force was necessary to prevent escape; and (3) has given some warning about the possible use of deadly force, if feasible." Robinson v. Arruqueta, 415 F.3d 1252, 1255 (11 Cir. 2005) (quoting Tennessee v. Garner, 471 U.S. 1 (1985)). Significantly, the Eleventh Circuit has specifically held that high-speed flight following a traffic offense does not provide sufficient basis for the use of deadly force. Harris, 433 F.3d at 815.

The defendants argue that they are entitled to qualified immunity. If the force applied was reasonable under the circumstances and not excessive, the police officer has not violated any clearly established constitutional right, and is entitled to summary judgment based upon qualified immunity. Moore v. Gwinnett County, 967 F.2d 1495, 1498 (11 Cir. 1992), quoting, Leslie v. Ingram, 786 F.2d 1533, 1536 (11 Cir. 1986). The defense of qualified immunity insulates governmental officials from personal liability for actions taken pursuant to their discretionary authority. See Saucier v. Katz, 533 U.S. 194 (2001); Harlow v. Fitzgerald, 457 U.S. 800 (1982); Flores v. Satz , 137 F.3d 1275 (11 Cir. 1998); Foy v. Holston, 94 F.3d 1528 (11 Cir. 1996).

There is no dispute that the defendants were acting within the scope of their discretionary authority. Thus, the question is whether, assuming the plaintiff's best case, each of the officers' actions violated clearly established law. The plaintiff contends that, after a high speed chase, Mercogliano approached him with a gun in hand yelling racial slurs. The plaintiff saw that Mercogliano was a uniformed police officer, and he attempted to

15

cooperate by unlocking his car door, but inadvertently lowered the rear passenger window.  At that point, Mercogliano fired his weapon into the plaintiff's car through the rear window, hitting him in the thigh.  The plaintiff then drove forward, and Mercogliano fired three more times towards the vehicle.  The plaintiff then stopped the car and leaned over the steering wheel, and Mercogliano opened the car door, shouted racial slurs, and punched him in the face. Officers Bowser and Grace arrived and helped Mercogliano drag the plaintiff out of the car, and they kicked him a few times while laughing. Although not alleged in the Amended Complaint, the plaintiff now claims that the officers knocked his teeth out and caused other bodily injuries.

      The key differences between the plaintiff's version of events and the defendant's version are whether the plaintiff, after the second time he was cut off by Bowser, put his car in reverse to attempt to strike Mercogliano or his motorcycle and from what position and at what point did Mercogliano fire his weapon.  The civilian witnesses both testified that they observed the plaintiff's car aiming towards Mercogliano, but both witnesses testified that Mercogliano did not reach for his gun or fire the gun until <u>after</u> the plaintiff had started driving away from Mercogliano in an attempt to flee.   In contrast, Mercogliano contends that after he drew his gun, the plaintiff started his car and drove toward him at a high rate of speed, and he shot the plaintiff through the front windshield, not through the passenger window as the plaintiff contends.  Further, the plaintiff alleges that all of the officers kicked and punched him after he was stopped, resulting in physical injuries, though he is not aware of the precise actions of each officer.  The defendants do not specifically deny these allegations; they impliedly deny them by omitting any mention of the use of force in their sworn testimony and arguing that the medical report showed only a gunshot wound.

16

Taking the plaintiff at his word, as the Court must do for the purposes of the current motions, the Undersigned concludes that none of the defendants is entitled to qualified immunity. Based on the evidence before the Court, there are genuine issues of material fact surrounding the circumstances of the shooting and the alleged use of force after the plaintiff was stopped. Under the plaintiff's best-case scenario, it is possible that Mercogliano might have acted unreasonably by shooting the plaintiff without apparent warning after he may have posed a danger to the officers or anyone else. Under the plaintiff's version of the events, as conformed by witness testimony, the plaintiff was driving <u>away</u> from Mercogliano before Mercogliano even reached for and fired his weapon, possibly obviating an argument that there was arguable probable cause to believe that the plaintiff posed a threat of serious physical harm or that the use of deadly force was necessary to prevent escape. Even if the plaintiff did place his car in reverse in an attempt to strike Mercogliano, once he started to drive away the imminent threat to the officer may then have disappeared.

The Undersigned is aware of the distorting effects of hindsight[7] and that the Court must consider the reasonableness of the defendants' alleged actions from their point of view, it is required to accept the plaintiff's version of the underlying facts.

---

[7] "[The Court is] not to view the matter ... from the comfort and safety of [its] chambers, fearful of nothing more threatening than the occasional paper cut as [it] read[s] a cold record accounting of what turned out to be the facts. [The Court] must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction could prove fatal." <u>Crosby v. Monroe County</u>, 394 F.3d 1328, 1333-34 (11 Cir. 2004).

17

Troupe v. Sarasota County, Fla., 419 F.3d 1160, 1168 (11 Cir. 2005). In arguing that the plaintiff was driving toward, rather than away from Mercogliano, and disputing the course after events after the stop and the extent of the plaintiff's injuries, the defendants implicitly ask the Court to weigh the plaintiff's credibility. However, the Court is obliged to resolve disputed facts in the plaintiff's favor. "Issues of credibility and the weight afforded to certain evidence are determinations appropriately made by a finder of fact and not a court deciding summary judgment." McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1240 n. 7 (11 Cir. 2003). Although the Court may reject fantastic or utterly implausible testimony at summary judgment, the plaintiff's testimony regarding the officers' conduct is not so outrageous or implausible that no reasonable juror could believe this portion of his testimony.  Cf. Kesinger ex rel. Kesinger v. Herrington, 381 F.3d 1243, 1249 (11 Cir. 2004) (rejecting as "not substantial evidence" an eyewitness's testimony which was directly controverted by physical evidence).

In short, the Undersigned finds that there are genuine issues of material fact which prevent this Court from applying the factors to determine whether the use of force, including the use of potentially deadly force, was reasonable under the circumstances.

Consequently, viewing the case in the light most favorable to Plaintiff, as the Court is required to do at this juncture, none of the defendants are not entitled to qualified immunity.  See Vaughan, 343 F.3d at 1332.

III.  Conclusion

It is therefore recommended that the defendant Mercogliano's Motion to Dismiss [DE# 22] and the joint Motion to Dismiss filed by

the defendants Bowser and Grace [DE# 24], both of which have been converted to Motions for Summary Judgment, be denied.

Objections to this report may be filed with the District Judge within ten days of receipt of a copy of the report.

It is so recommended at Miami, Florida, this 28th day of February, 2008.

_____
UNITED STATES MAGISTRATE JUDGE


cc: Ronald C. Williams, <u>Pro Se</u>
    DC# L16890
    Okeechobee Correctional Institution
    3420 N.E. 168th Street
    Okeechobee, FL 34972-4824

    Scott David Alexander, Esq.
    E. Bruce Johnson, Esq.
    Carolyn Egan, Esq.
    JOHNSON, ANSELMO, MURDOCH,
        BURKE, PIPER & MCDUFF, PA
    2455 E. Sunrise Blvd., Suite 1000
    P.O. Box 030220
    Fort Lauderdale, FL 33304-0220